# In the United States Court of Federal Claims

No. 21-1900 C
Filed: September 22, 2023

---

|  |  |
|---|---|
| PEANUT WAGON, INC., | ) |
|  | ) |
|  | ) |
| *Plaintiff,* | ) |
|  | ) |
| v. | ) |
|  | ) |
| THE UNITED STATES, | ) |
|  | ) |
| *Defendant.* | ) |
|  | ) |

---

*Kevin R. Garden*, The Garden Law Firm, Alexandria, VA, for Plaintiff.

*Antonia R. Soares*, Senior Trial Attorney, United States Department of Justice, Civil Division, Commercial Litigation Branch, Washington, D.C., with whom were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Patricia M. McCarthy*, Director, *L. Misha Preheim*, Assistant Director, and *Ryan J. Chance*, Attorney Advisor, Department of the Interior, Office of the Solicitor, Branch of National Parks, *Robert C. Eaton*, Attorney Advisor, Department of the Interior, Office of the Solicitor, Branch of National Parks, and Deborah S. Bardwick, Attorney Advisor, Department of the Interior, Office of the Solicitor, San Francisco Field Office, of counsel, for Defendant.

## OPINION AND ORDER

**MEYERS, Judge**.

Peanut Wagon, Inc. had a concession contract with the United States to operate a restaurant, the Cliff House, on National Park Service property. That contract required Peanut Wagon to perform certain capital improvements to the facility in return for a "possessory interest" that was determined by straight-line depreciation of the actual cost of the improvements over their useful life. At the end of the contract, the Government or a successor contractor was required to pay Peanut Wagon for its possessory interest. Within months of executing the contract, however, Congress amended the statute governing concession contracts and provided the concessioner a "leasehold surrender interest" in the capital improvements. This interest is more favorable to a concessioner because it is tied to the actual value of the improvement and the Consumer Price Index. The new statute, however, grandfathered contracts executed prior to its effective date, allowing the straight-line depreciation to continue. But, if a concessioner under the old statute got a new concession contract to replace its old one, the contractor's possessory interest would change to a leasehold surrender interest. Given this backdrop, Peanut Wagon has brought numerous claims to recover amounts it claims to be owed under various theories.

The Government has moved to dismiss for lack of subject matter jurisdiction and for judgment on the pleadings. The Government argues that certain claims are not ripe because Peanut Wagon has not submitted those claims to the Government for payment and, therefore, no dispute presently exists. But this contract is not subject to the Contract Disputes Act and there is no pre-filing requirement that the Government points to. While the parties did engage in a process whereby Peanut Wagon submitted its costs for payment, that was not mandatory. Thus, the claim here is that a contract required the Government to pay Peanut Wagon an amount and the Government has only agreed to pay less. Without a pre-filing requirement, that claim is ripe (of course, if the Government does not dispute the higher amount Peanut Wagon seeks, it is free to settle this portion of the case).

The Government also contends that the existence of the express contract precludes the existence of an implied-in-fact contract, thus depriving the Court of jurisdiction over Peanut Wagon's implied-in-fact contract claims. The parties extended the concession contract three times, moving the contract's end date from 2018 to 2020. Peanut Wagon challenges the validity of the contract extensions because the Government failed to comply with mandatory notice requirements before executing the contract extensions, rendering them void. If Peanut Wagon is correct, the express contract ended, and the relationship governed by implied-in-fact contracts. Because Peanut Wagon's allegations are nonfrivolous, the Court has jurisdiction to decide whether they have merit.

The Government alternatively moves for judgment on the pleadings. First, the Government argues that Peanut Wagon failed to plausibly allege that each contract extension created a new concession contract thereby terminating the one it sought to extend. Second, the Government explains that it did not have a duty to award a successor contract prior to the contract's expiration, and therefore Peanut Wagon has not plausibly alleged that the Government violated such duty. Third, the Government asserts that Peanut Wagon has not plausibly alleged that its decision to discontinue operations of the Cliff House was unlawful. Finally, the Government argues that Peanut Wagon has not plausibly alleged that it is entitled to higher compensation under the terms of the express contract and governing law. The Court mostly agrees. Because the Parties extended the express contract, the implied-in-fact contract theories necessarily fail. And the Court agrees with the Government that the express contract disposes of most of Peanut Wagon's claims. But Peanut Wagon has plausibly alleged an entitlement to additional compensation under the terms of the express contract. Therefore, the Court grants-in-part and denies-in-part the Government's motion to dismiss.

## I.    Background

### A.    Statement of facts.

The Cliff House is a restaurant perched on a cliff near San Francisco, California, overlooking the Pacific Ocean. ECF No. 1 ¶ 4. Over the years, it has become a tourist destination with international recognition. ECF No. 1 ¶ 5. In fact, the Cliff House's location has long housed a restaurant. The first one to operate there opened its doors in 1863. ECF No. 1 ¶ 6.

Demosthenis ("Dan") and Mary Hountalas own Peanut Wagon, Inc. ("PWI"). They have managed and operated the Cliff House restaurant beginning in 1973, and incorporated PWI in

1974.  ECF No. 1 ¶¶ 7-8.  In 1977, the United States National Park Service ("NPS") acquired the Cliff House and began to administer the site as part of the Golden Gate National Recreational Area.  ECF No. 1 ¶ 9.  PWI continued to operate the Cliff House under a series of special use permits from 1978 until 1998.  ECF No. 1 ¶¶ 9-11, 18-21.  In 1997, NPS issued a solicitation for a long-term concession contract to operate the Cliff House, which PWI won.  ECF No. 1 ¶¶ 18-20.

On September 16, 1998, PWI and NPS executed Concession Contract No. CC-GOGA010-98 (the "Contract"), pursuant to the NPS Concessions Policy Act of 1965, Pub. L. No. 89-249, 79 Stat. 969 (Oct. 9, 1965), formerly codified as amended at 16 U.S.C. §§ 20-20(g) (1994).  *See generally* ECF No 1-1.[1]  The Contract was for a term of twenty years, expiring on June 30, 2018.  It required PWI to establish and operate certain "necessary facilities and services . . . at reasonable rates under the supervision and regulation of the Secretary [of the Interior.]" ECF No 1-1 at 4.  The services the Contract required included food, beverage, observation, weather forecasting, and gift services, as well as the completion of "an improvement and building program ([the] 'Improvement Program') costing not less than $7.975 million dollars ($7,975,000) as adjusted to reflect par value in the year of actual construction in accordance with the appropriate indexes of the Department of Commerce's 'Construction Review.'"  ECF No 1-1 at 5-7.  Specifically, the Improvement Program obligated PWI to rehabilitate the Cliff House and construct a new wing while retaining its 1909 core building structure, ensuring compliance with current building codes, and achieving energy efficiency and sustainable practices in executing the initial design and future operations.  ECF No. 1-1 at 5; ECF No. 1 ¶ 20.  In administering the Contract, "the Secretary is required to exercise his authority . . . in a manner consistent with a reasonable opportunity by the Concessioner [PWI] to realize a profit on the operations conducted [t]hereunder as a whole commensurate with the capital invested and the obligations assumed." ECF No 1-1 at 4.  And PWI agreed that its investment in the Improvement Program did not conflict with such obligations.  ECF No. 1-1 at 5, 7-8 ("It is agreed that such investment is consistent with Section 3(a) hereof[,]" which provides that PWI "shall not be required to make investments inconsistent with a reasonable opportunity to realize a profit on its operations . . . commensurate with the capital invested and obligations assumed.").

---

[1] The Contract and its amendments are attached to the Complaint, ECF No. 1-1, and incorporated into it.  *See, e.g.*, ECF No. 1 ¶ 20; *see also id*. ¶¶ 21-36 (discussing various Contract provisions). Therefore, the Court may consider the Contract without converting this motion into one for summary judgment under RCFC 56.  *Akins v. United States*, 82 Fed. Cl. 619, 622 (2008) ("Where . . . the Court relies only on undisputed documents attached as exhibits to the complaint, the Court may proceed without converting the motion to dismiss to one for summary judgment.").  Further, the Government has attached additional documents that PWI incorporated into the Complaint.  *See* ECF No. 12-1.  For each document, the Government's index specifies the specific paragraphs of the Complaint that incorporate the attached documents. *Id*.  PWI has not objected to the consideration of any of these documents in resolving the present motion.  Therefore, the Court considers the documents in ECF No. 12-1.

The Contract further obligated PWI to make capital improvements, i.e., "major repairs and/or improvements that serve to prolong the life of the Government Improvement[2] to an extent requiring capital investment for major repair[,] . . . at its expense if consistent with a reasonable opportunity for the Concessioner to realize a profit . . . ." ECF No. 1-1 at 11; *see also* ECF 1-1 at 11-12 ("Concessioner will physically maintain and repair all facilities (both Government Improvements and Concessioner Improvements) used in operations under this Contract, included maintenance of assigned lands and all necessary housekeeping activities associated with such operations . . . ."). In consideration, PWI "shall have a Possessory Interest . . . in capital improvements . . . it makes to Government Improvements (excluding improvements made from funds from any Section 10 accounts)[3] with the written permission of the Secretary." ECF No. 1-1 at 10. If such Possessory Interest is acquired by the Government or a successor concessioner at any time, the Government must compensate PWI in accordance with Section 13 of the Contract. ECF No. 1-1 at 10. Further, PWI's Possessory Interest "shall not be extinguished by the expiration or other termination of this Contract and may not be terminated or taken for public use without just compensation as determined in accordance with Section 13." ECF No. 1-1 at 13; *see also* ECF No. 1-1 at 22 ("In the event of termination or expiration of this Contract, the total compensation to the Concessioner . . . shall be as described in Section 13 ('Compensation') of this Contract."). And the Parties agreed that "compensation described in . . . Section [13] shall constitute full and just compensation to the Concessioner from the Secretary for all losses and claims occasioned by the circumstances discussed" therein. ECF No. 1-1 at 23.

Section 13 provides that, upon the Contract's expiration or termination, if "the Secretary intends for substantially the same or similar operations to be continued by a successor," PWI must "sell and transfer to the successor . . . its Possessory Interest in Concessioner Improvements and Government Improvements, if any, . . . and all other tangible property . . . used or held for use . . . in connection with [its] operations . . . ." ECF No. 1-1 at 23-24. In turn, the successor must pay PWI "the fair value thereof." ECF No. 1-1 at 24. The Parties agreed that the "fair value" of merchandise and supplies shall equal actual cost, including transportation, and fair value of equipment shall equal the depreciated book value based on initial acquisition cost, less obsolescence. ECF No. 1-1 at 24. Concessioner Improvements in effect prior to the Contract shall have a fair value of $0 and, for Government Improvements in effect prior to the Contract, fair value shall equal "the book value of the improvements as of the last day of the contract under which such Possessory Interest was obtained, subject to further reduction in accordance with the

---

[2] "'Government Improvements' as used herein, means the buildings, structures, utility systems, fixtures, equipment, and other improvements affixed to or resting upon the lands assigned hereunder in such a manner to be part of the realty, if any, constructed or acquired by the Secretary and assigned to the Concessioner . . . ." ECF No. 1-1 at 10.

[3] Section 10(a) provides that, "[a]s consideration for the use and occupancy of Government Improvements[,]" PWI must "establish and manage a 'Government Improvement Account'" to satisfy certain obligations under the Contract. ECF No. 1-1 at 20. The Parties agreed that the Improvement Program was the "priority use" for the Account, and PWI "shall have no ownership, Possessory Interest, or other interest in improvements made from funds from the Government Improvement Account." ECF No. 1-1 at 20-21.

continuation of the same deprecation schedule for such improvements used under the previous concession contract."  ECF No. 1-1 at 24.  The Contract further provides that:

> The fair value of Possessory Interest in Concessioner Improvements and Government Improvements made after the effective date of this Contract shall be . . . the original cost of the improvements less straight line depreciation over the estimated useful life of the asset according to Generally Accepted Accounting Principles, provided, however, that in no event shall any such useful life exceed 30 years. In the event that such Possessory Interest is acquired by a successor, the successor will not be permitted to revalue such Possessory Interest, or, alter its depreciation schedule or useful life.

ECF No. 1-1 at 24.  If the Secretary decides to discontinue PWI's operations without a successor, "the Secretary will take such action as may be necessary to assure [PWI] of compensation for (i) its Possessory Interest in Concessioner Improvements and Government Improvements, if any," (ii) necessary restoration costs to the land, and (iii) "the cost of transporting to a reasonable market for sale such movable property of [PWI] as may be made useless by such determination." ECF No. 1-1 at 25.

PWI initiated design and construction in accordance with the Improvement Program in 1998 and, upon completing the project in 2004, had expended approximately $14 million of its own funds.  ECF No. 1 at 12 ¶ 49.[4]  On October 9, 2009, the Parties amended the Contract ("Amendment No. 2") to include a franchise fee equal to 10.0% of PWI's gross receipts in excess of $11.5 million for the 2009 fiscal year, with an annual threshold to increase or decrease thereafter in accordance with the Consumer Price Index ("CPI").  ECF No. 1-1 at 38.  The Amendment also established that PWI held an aggregate possessory interest in Government Improvements of $9,079,494.00 at the time of its execution.  In addition, Amendment No. 2 included a straight-line depreciation schedule for this possessory interest, which provided that the fair value of such possessory interest at the Contract's expiration in June 2018 would be $4,329,984.00.  ECF No. 1 at 13-14 ¶¶ 58-64; ECF No. 1-1 at 42-44.  And the depreciation schedule continued past June 2018 all the way through December 31, 2036.  ECF No. 1-1 at 42-44, 52.

On July 5, 2011, PWI executed Amendment No. 3, which obligated the Secretary to pay PWI an initial pre-payment of its Fair Value of Possessory Interest in the amount of $500,000.00 and allowed the Secretary "to make subsequent possessory interest pre-payments prior to the

---

[4] NPS detailed the amounts that PWI spent on the Improvement Program in the solicitation for a follow-on concession contract.  *See* ECF No. 12-1 at A198 ("In 2006, the Concessioner completed a major stabilization, rehabilitation, and new construction project costing approximately $20 million, of which approximately $6 million was funded by NPS directly, $5 million from contractually required reserve funded by the Concessioner, and $9 million funded by the Concessioner and identified as 'possessory interest' in the Existing Contract that will be fully paid off by NPS by the expiration of the Existing Contract.").  The Complaint relies on this solicitation at ¶¶ 120-23.

expiration or termination of the Contract." ECF No. 1-1 at 52.  And Amendment No. 3 provided that, upon expiration or termination of the Contract, any such possessory interest pre-payment amounts, as adjusted for inflation in accordance with the CPI (calculated from the effective date of each possessory interest pre-payment to the effective date of the Contract's expiration or termination), would be deducted from the final fair value of possessory interest due to PWI. ECF No. 1-1 at 53.[5]  Between March 2012 and September 2018, NPS made six pre-payments to PWI, totaling $3,600,000.00, to be adjusted for inflation and deducted from the fair value of possessory interest owed to PWI at the termination or expiration of the Contract.  ECF No. 1 ¶¶ 109-10; ECF 12-1 at A268-79 (written notices of prepayments addressed in ECF No. 1 ¶¶ 109-10).  With these pre-payments, NPS stated that Amendment No. 2 "provided a detailed depreciation schedule of possessory interest" and, as a result, "the Contract, as amended, provides the actual basis for possessory interest and procedures for adjusting pre-payments, to calculate the concessioner's final amount of possessory interest compensation at the expiration of the Contract." ECF 12-1 at A271-80.

In 2016, PWI requested to extend the Contract "[b]ecause of the lack of profitability and the expansion of the construction period[,] . . . which essentially reduced the period of the Contract during which a profit could be made from 20 to 13 years . . . ." ECF No. 1 at 16 ¶ 72. Specifically, PWI claimed its obligation under the Contract to allocate 10% of its gross annual revenue to the GIA during design and construction of the Improvement Program "depriv[ed] it of any opportunity to make a profit on its operation of the Concession while remaining open." ECF No. 12-1 at A150. And, after performing repairs beyond "routine 'maintenance,'" encountering unforeseen economic challenges, and experiencing protracted design and construction periods (allegedly caused by NPS), PWI "was deprived of several years of the ability to operate the completed facility and amortize its investment." ECF No. 12-1 at A151-54; ECF No. 1 ¶ 48 ("During PWI's efforts to complete the Contract's improvement and building program, NPS repeatedly caused delays . . . [by] changing the design plans . . . which added significant time and expense in the procurement of restorative materials."). Also in 2016, the Cliff House's heating, ventilation, and air conditioning ("HVAC") system began to fail, and NPS agreed to provide PWI with a possessory interest related to its cost of replacement, "with the condition that the total HVAC Project cost will not exceed $600,000 and will be depreciated over an estimated useful life of 15 years." ECF No. 12-1 at A179. PWI claimed it incurred a cost of $964,078.40 to install the new HVAC system. ECF No. 12-1 at A251.

NPS denied PWI's request to extend the Contract on March 2, 2017, finding "PWI [] had a reasonable opportunity for profit throughout the term of the Contract." ECF 12-1 at A177. NPS emphasized that the Contract included "recurring franchise fee reconsideration periods that were structured to account for possible changes in the operation, including impacts by the economy, and provide an opportunity, although not a guarantee, for reasonable profit through periodic adjustment of the franchise fee." ECF No. 12-1 at A177-179. Accordingly, NPS concluded, "[g]iven the fair and equitable fee structure in place and no action requested or taken

---

[5] The CPI adjustment rate is determined by dividing the present CPI index by the beginning CPI index, i.e., ending CPI / beginning CPI. To determine the possessory interest payment amount as adjusted for inflation, the CPI adjustment rate is multiplied by the pre-payment amount.  ECF No. 1-1 at 53.

during the last fee reconsideration period[,]" PWI had reasonable opportunity for PWI to realize a profit. ECF No. 12-1 at A178. NPS determined, however, "an extension of the . . . Contract [was] warranted for a different reason—to allow for the development of a successor agreement regarding operation of the Cliff House and smooth transition between the two agreements . . . ." ECF No. 12-1 at A178. NPS sought such extension for a "reasonable period of time[,]" not expected to exceed one year. ECF No. 12-1 at A179. Thereafter, the Parties executed three letter agreements, which incrementally extended the Contract until December 31, 2020 "in order to avoid interruption of visitor services." ECF No. 12-1 at A116-18 (successive letter agreements extending the Contract until (i) December 31, 2018, (ii) December 31, 2019, and (iii) December 31, 2020, respectively).

On August 13, 2019, NPS issued a Request for Qualifications ("RFQ") for a successor concession contract, "seeking an exceptional individual, organization, or team with restaurant management expertise to join the community of park-based partners as the lessee and operator of the . . . properties . . . being operated as the Cliff House and Lookout Café" (together, "the Cliff House"). ECF No. 12-1 at A196. NPS acknowledged that PWI held registered trademarks for the Cliff House and provided that any selected Lessee "will be required to use a single, identifying name for the operations" subject to NPS approval. ECF No. 12-1 at A200. The RFQ provided that the Lessee shall hold financial responsibility for capital improvements during the term of the Lease, as well as "all operating and maintenance expenses, such as expenses for repairs, maintenance, component renewal or replacement, and capital improvements necessary to maintain a high-quality operation . . . ." ECF No. 12-1 at A196. The RFQ further emphasized that the Lessee must "purchase . . . tangible personal property including furniture, fixtures, equipment, memorabilia, merchandise and supplies" from PWI used in connection with its operation of the Cliff House, and that "[t]his transaction is between the Concessioner and the Lessee without NPS involvement." ECF No. 12-1 at A200. Because PWI did not intend to submit a bid to secure the new concession contract, PWI agreed to assist Aramark Corporation in developing its response to the RFQ. ECF No. 1 ¶¶ 125-26; ECF No. 12-1 at A228.

In March 2020, the COVID-19 pandemic caused PWI to close the Cliff House restaurant for business. ECF No. 1 ¶ 139; ECF No. 12-1 at A226. Even though the restaurant was closed for business, PWI continued to have the HVAC repairs completed over the next few months. ECF No. 1 ¶¶ 140-41. PWI then engaged in discussions with NPS over the summer, and on September 12, 2020, PWI requested to cease operations prior to the December 31, 2020, contract expiration. ECF No. 1 ¶ 148 ("After discussions with local NPS representatives throughout June 2020, on September 12, 2020, PWI's attorney formally emailed NPS informing it that PWI was incurring extensive losses and wished to cease operations prior to the end of the purported impending extension period date of December 31, 2020."); ECF No. 12-1 at A233. NPS denied PWI's request on December 3, 2020, explaining that "NPS cannot agree to terminate the Contract early (that is, to waive a vested contract right) without receiving from Peanut Wagon, Inc. a 'compensating benefit' to the government." ECF No. 12-1 at A233; ECF No. 1 ¶ 149. NPS also indicated that, because "[t]he COVID-19 pandemic . . . unexpectedly and vastly changed the food and beverage market in the San Francisco area and throughout the country[,]" it would not proceed, at that time, with its solicitation to select a successor lessee for the Cliff House. ECF No. 12-1 at A233. Therefore, NPS discontinued operations following the Contract's expiration, entitling PWI to compensation for its possessory interest as prescribed under the Contract, as well as costs for transporting its personal property from the Cliff House

premises for sale in the San Francisco market.  ECF No. 12-1 at A233 ("Section 13(c) of your Contract, where operations are to be discontinued, applies to this expiration. This section ensures Peanut Wagon, Inc. compensation for its possessory interest in Government Improvements and requires removal of personal property within a reasonable timeframe . . . .").  PWI ceased operations at the Cliff House on December 31, 2020.  ECF No. 1 ¶ 159.  There was no successor contractor in place at that time.

On August 17, 2021, NPS cancelled its outstanding solicitation for a successor concessioner for the Cliff House, stating its intent to "issue a revised request for proposals (RFP)[6] in the coming months . . . [that] will take into consideration the impacts the pandemic has had on the food and beverage industry . . . ."  ECF No. 12-1 at A285-86.  On April 20, 2021, NPS provided PWI with an Agreement to memorialize its final entitlement to compensation under the Contract as of its expiration.  ECF 12-1 at A256.  In doing so, NPS stated:

> (1) the Secretary and Concessioner agreed in Amendment No. 2 to the Contract, effective October 9, 2009, that the Concessioner's total claims of possessory interest in its capital improvements to Government Improvements . . . [was] $9,079,494.00; . . . .
>
> (2) the Secretary and Concessioner further agreed upon a depreciation schedule . . . for the purposes of determining the Concessioner's future fair value of possessory interest for compensation of such upon the expiration or termination of the Contract; . . .
>
> (3) the Secretary and Concessioner agreed to the Concessioner's accrual of additional possessory interest for the completion of a [HVAC] replacement project in the amount of $956,571; . . .
>
> (4) after depreciation, the Fair Value of Possessory Interest in Government Improvements as of the December 31, 2020 expiration of the Contract totaled $4,630,929;
>
> (5) the Secretary and Concessioner agreed in Amendment No. 3 to the Contract, effective February 23, 2012, to an initial pre-payment of the Concessioner's Fair Value of Possessory Interest . . . in the amount of $500,000, which the Secretary paid to the Concessioner on March 14, 2012 ("First PI Pre-Payment"); . . .
>
> (6) any subsequent possessory interest prepayment amounts would be deducted from the Fair Value of Possessory Interest to determine the final amount due to the Concessioner upon expiration or termination of the Contract, as adjusted for inflation as described in Amendment No. 3; . . .

---

[6] NPS released the revised RFP on January 18, 2022.  ECF No. 12-1 at A265-66.

> (7) the Secretary made additional pre-payment amounts toward the Concesser's Fair Value of Possessory Interest as follows: $1,000,000 on September 12, 2013 ("Second PI Pre-Payment"); $1,000,000 on September 21, 2015 ("Third PI Pre-Payment"); $500,000 on September 8, 2016 ("Fourth PI Pre-Payment"); $500,000 on September 7, 2017 ("Fifth PI Pre-Payment"); and $100,000 on September 11, 2018 ("Sixth PI Pre-Payment") (collectively "PI Pre-Payments"); . . .
>
> (8) the collective total of all PI Pre-Payments made to the Concesser, before adjustment for inflation, is $3,600,000; . . .
>
> (9) the collective value of all PI Pre-Payments to the Concesser, after adjustment for inflation, is $4,256,003; and . . .
>
> (10) deducting the value of PI Pre-Payments adjusted for inflation ($4,256,003) from the Fair Value of Possessory Interest ($4,630,929) as of the expiration date of *the Contract results in a final amount due to the Concesser of $374,925* ("Net PI Value"), rounded, under the terms and conditions set forth in this Agreement.

ECF No. 12-1 at A256-57 (emphasis added) (cleaned up).

On April 26, 2021, PWI asked NPS to reserve $655,626.00 from the release of its outstanding possessory interest, calculated to restore depreciation after the expiration of the Contract's original term on June 30, 2018. ECF No. 12-1 at A253; *see* ECF No. 1-1 at 44 (showing difference in depreciated PI value as of June 30, 2018 ($4,329,984.00) and December 31, 2020 ($3,674,358.00) equals $655,626.00). But because "the agreed-upon depreciation schedule for the value of PWI's PI continued to apply until the expiration of the Contract on December 31, 2020[,]" NPS denied PWI's request as "inconsistent" with the terms of the "clear and unambiguous" Contract. ECF No. 12-1 at A253. NPS further explained that "[w]hile we understand the toll the pandemic has taken on all concessers, this circumstance does not change the previously agreed upon total claims of PWI's PI and depreciation schedule of that PI." ECF No. 12-1 at A254. According to NPS, the depreciation scheme to calculate PWI's possessory interest, as agreed upon in Amendment Nos. 2 and 3, applied until the expiration of the Contract on December 31, 2020. ECF No. 12-1 at A254. NPS requested that PWI "sign and return the Agreement that was provided . . . so that the NPS may make the final payment for PI due to PWI under the Contract." ECF No. 12-1 at A254. The Parties did not finalize the Agreement, and NPS has not paid PWI the final $374,925.00 possessory interest due under the Contract.

## B.    The statutory framework.

Before turning to the merits, it is necessary to understand the relevant statutes that govern the contracts at issue. The 1965 Concessions Act (the "1965 Act"), under which the Contract was executed, authorized the Secretary of Interior to "take such action as may be appropriate to

encourage and enable private persons and corporations to provide and operate facilities and services which [the Secretary] deems desirable for the accommodation of visitors in areas administered by the National Park Service." 16 U.S.C. § 20a (Supp. II 1966).[7]  Under the 1965 Act and the Contract, the Secretary must exercise such authority "in a manner consistent with a reasonable opportunity for the concessioner to realize a profit on his operation as a whole commensurate with the capital invested and the obligations assumed."  16 U.S.C. § 20b(b); ECF No. 1-1 at 4; *see also* 16 U.S.C. § 20b(a) (Secretary may protect concessioners against loss of investment (not profit) resulting from Secretarial discretion to cease, in whole or in part, or to transfer, contract operations).  "Such terms and conditions may include an obligation of the United States to compensate the concessioner for the loss of investment . . . ."  16 U.S.C. § 20b(a).  Accordingly, the 1965 Act entitles concessioners, such as PWI, to hold a possessory interest in certain improvements acquired or constructed pursuant to valid concessioner contracts.  16 U.S.C. § 20e ("A concessioner who has heretofore acquired or constructed or who hereafter acquires or constructs, pursuant to a contract and with the approval of the Secretary, any structure, fixture, or improvement upon land owned by the United States within an area administered by the [NPS] shall have a possessory interest therein").  Such "possessory interest[s] shall not be extinguished by the expiration or other termination of the contract and may not be taken for public use without just compensation."  16 U.S.C. § 20e.  And, unless otherwise agreed by the Parties:

> [J]ust compensation shall be an amount equal to the sound value of such structure, fixture, or improvement at the time of taking by the United States determined upon the basis of reconstruction cost less depreciation evidenced by its condition and prospective serviceability in comparison with a new unit of like kind, but not to exceed fair market value.

16 U.S.C. § 20e.  In other words, the statutory default for determining a concessioner's possessory interest under the 1965 Act is "sound value" less depreciation *only if* the underlying agreement is silent as to the method for such calculation.  *Id.*

On November 13, 1998, a mere two months after the parties entered the Contract, the 1998 Concessions Act (the "1998 Act") repealed and replaced the 1965 Act.  *See* Title IV, 112 Stat. 3497, 3503-18, codified as amended at 54 U.S.C. §§ 101911-101926.  The 1998 Act explicitly provides that the "repeal of [the 1965] Act shall not affect the validity of any concessions contract or permit entered into under such Act, but the provisions of this title shall apply to any such contract or permit *except to the extent such provisions are inconsistent with the terms and conditions of any such contract or permit*."  112 Stat. at 3515-16 (emphases added).  Accordingly, if a contract under the 1965 Act sets forth a compensation scheme, a concessioner "shall, on the expiration or termination of the concession contract, be entitled to receive compensation for the possessory interest improvements in the amount and manner as described by the concession contract."  54 U.S.C. § 101915(c)(1).  "Where [a] possessory

---

[7] Congress has repealed the 1965 Act in its entirety and replaced it with the 1998 Act.  Citations to the 1965 Act are to its former codification in Title 16 of the U.S. Code.  Citations to the 1998 Act are to its current codification in Title 54.

interest is not described in the existing concession contract, compensation of possessory interest shall be determined in accordance with the laws in effect on November 12, 1998." 54 U.S.C. § 101915(c).

Importantly, the 1998 Act provides concessioners a leasehold surrender interest ("LSI"), rather than a possessory interest, in "structure[s], fixture[s], or nonremovable equipment provided by a concessioner pursuant to the terms of a concession contract and located on land of the United States within a [NPS] unit." 54 U.S.C. § 101915(a)(1). "The value of a leasehold surrender interest in a capital improvement shall be an amount equal to the initial value (construction cost of the capital improvement)[,]" subject to inflation and depreciation, "as evidenced by the condition and prospective serviceability in comparison with a new unit of like kind." 54 U.S.C. § 101915(b)(5). In the case of a new concession contract, if the Secretary projects a concessioner will hold an LSI in a capital improvement of more than $10,000,000, that LSI value shall be depreciated on (i) "an annual basis, in equal portions, over the same number of years as the time period associated with the straight line depreciation of the initial value (construction cost of the capital improvement) . . . in effect on November 12, 1998; or (ii) an alternative formula" as determined by the Parties. 54 U.S.C. § 101915(b)(6)(A).

### C. PWI's Complaint.

PWI filed suit in this Court on September 24, 2021, alleging NPS incorrectly calculated the fair value of PWI's possessory interest under the Contract, and it is entitled to more compensation "in an amount which will be proven at trial[.]" ECF No. 1 at 31-35 ¶¶ 179-204. The Government asserts that, under the express terms of the Contract, PWI is entitled to $374,925.00 for its possessory interest, which was accurately set forth in the proposed agreement. ECF No. 12 at 4. The Government moves to dismiss under Rules 12(b)(1) and 12(c).

## II.   Jurisdiction and Standard of Review

The Tucker Act, 28 U.S.C. § 1491(a)(1), confers this Court's jurisdiction to adjudicate "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." Jurisdiction, when based on contract, "extends only to contracts either express or implied in fact, and not to claims on contracts implied in law." *Hercules, Inc. v. United States*, 116 S. Ct. 981, 985 (1996). It is the plaintiff's burden to establish this Court's jurisdiction by a preponderance of evidence. *Haynes v. United States*, 122 Fed. Cl. 166, 169 (2015); *see also Kelley v. Sec'y, U.S. Dep't of Labor*, 812 F.2d 1378, 1380 (Fed. Cir. 1987). Whether the Court has jurisdiction to decide the merits of a case is a threshold matter. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998). "Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." *Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1868).

When deciding a Rule 12(b)(1) motion to dismiss, the Court "must accept as true all undisputed facts asserted in the . . . complaint and draw all reasonable inferences in favor of the

[non-movant]." *Acevedo v. United States*, 824 F.3d 1365, 1368 (Fed. Cir. 2016) (quoting *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011)). Further, the Court "presumes that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990). The Court may consider not only "the allegations in the complaint, [but] may also look to 'matters incorporated by reference or integral to the claim, items subject to judicial notice, [and] matters of public record.'" *A&D Auto Sales, Inc., v. United States*, 748 F.3d 1142, 1147 (Fed. Cir. 2014) (quoting 5B Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE § 1357 (3d ed. 2004)); *see Terry v. United States*, 103 Fed. Cl. 645, 652 (2012) (collecting cases). If the Court determines that it lacks subject matter jurisdiction, "the court must dismiss the action." RCFC 12(h)(3).

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." RCFC 12(c). The Court will grant a motion for judgment on the pleadings when "there are no material facts in dispute and the [moving] party is entitled to judgment as a matter of law." *Forest Labs., Inc. v. United States*, 476 F.3d 877, 881 (Fed. Cir. 2007) (citations omitted); *Zhang v. United States*, 89 Fed. Cl. 263, 267 (2009). When deciding a motion for judgment on the pleadings, the Court may consider "the content of the competing pleadings, exhibits thereto, matters incorporated by reference in the pleadings, whatever is central or integral to the claim for relief or defense, and any facts of which the . . . court will take judicial notice." *Crusan v. United States*, 86 Fed. Cl. 415, 417 (2009) (citing 5C Wright & Miller, FEDERAL PRACTICE AND PROCEDURE § 1367 (3d ed. 2008)). And "[e]ven where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint." *Bell/Heery v. United States*, 106 Fed. Cl. 300, 307 (2012) (quoting *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006)). The Court "must assume all well-pled factual allegations are true and indulge in all reasonable inferences in favor of the nonmovant." *Ins. Co. v. United States*, 464 F.3d 1325, 1327-28 (Fed. Cir. 2006) (quoting *Anaheim Gardens v. United States*, 444 F.3d 1309, 1314–15 (Fed. Cir. 2006)).

"The legal standard applied to evaluate a motion for judgment on the pleadings is the same as that for a motion to dismiss" for failure to state a claim. *Clear Creek Cmty. Servs. Dist.*, 132 Fed. Cl. 223, 244 (2017) (citing *Cary v. United States*, 552 F. 3d 1373, 1376 (Fed. Cir. 2009)). "A motion to dismiss . . . for failure to state a claim upon which relief can be granted is appropriate when the facts asserted by the plaintiff do not entitle him to a legal remedy." *United Pac. Ins. Co.*, 464 F.3d at 1327-28 (quoting *Boyle v. United States*, 200 F.3d 1369, 1372 (Fed. Cir. 2000)). As the Supreme Court explained, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). And to be "plausible on its face," it "does not need detailed factual allegations." *Twombly*, 550 U.S. at 555; *see also Cary v. United States*, 552 F.3d 1373, 1376 (Fed. Cir. 2009) (Rule 8 "does not require the plaintiff to set out in detail the facts upon which the claim is based, but enough facts to state a claim to relief that is plausible on its face."). In other words, the Complaint must contain enough detail "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "Conclusory allegations of law and unwarranted inferences of fact do not suffice to support a claim." *Bradley v. Chiron Corp.*, 136 F.3d 1317, 1322 (Fed. Cir. 1998) (citations omitted). Finally, it is proper for the Court to interpret a contract when deciding a motion to

dismiss.  *E.g.*, *Canpro Invs. Ltd. v. United States*, 130 Fed. Cl. 320, 347 (2017) (citing *Bell/Heery v. United States*, 739 F.3d 1324, 1330 (Fed. Cir. 2014)).

## III.   Discussion

### A.   PWI's claim seeking "additional expenditures" related to its replacement of the HVAC system is ripe.

PWI complains that NPS failed to calculate compensation for "additional expenditures" incurred in connection with its installation of the HVAC system.  ECF No. 1 at ¶¶ 144-45.  Although the Parties agreed "PWI's costs totaled $956,571" with respect to the HVAC system, PWI claims "the total costs of $956,571 did not include extensive labor invested by PWI in setting up a competitive bidding process required by NPS for the new HVAC system and overseeing its installation" or financing costs.  ECF No. 1 at ¶¶ 143-145.  And PWI "continued to diligently work towards completion of the HVAC system after shutting down operations in March of 2020 and pursuant to the parties' agreement that PWI would be compensated for its costs in the effort."  ECF No. 1 at ¶ 140.  PWI therefore argues that NPS "owed the full value of its costs for constructing the HVAC system based on both the Contract and the implied-in-fact contract that followed after the Contract, as well as under theories of *quantum meruit* and *quantum valebant*."  ECF No. 1 at ¶ 146.  NPS responds that PWI "has neither submitted such expenditures to NPS nor received a denial from the agency, [and] it cannot claim a breach based on such claims because they are not ripe."  ECF No. 12 at 35 (citing *Rothe Dev. Corp. v. Dep't of Def.*, 413 F.3d 1327, 1335 (Fed. Cir. 2005) (explaining that "a case is not ripe if further factual development is required")).  Accordingly, NPS contends "PWI presents nothing more than an abstract disagreement that is not ripe for judicial review."  ECF No. 12 at 23-24.

When determining whether a dispute is ripe for judicial review, the Court must evaluate: "(1) the 'fitness' of the disputed issues for judicial resolution; and (2) 'the hardship to the parties of withholding court consideration.'"  *Shinnecock Indian Nation v. United States*, 782 F.3d 1345, 1348 (Fed. Cir. 2015) (citing *Abbott Labs. v. Gardner,* 387 U.S. 136, 148 (1967)).  Indeed, "[a] claim for relief is not ripe for adjudication when it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'"  *Pernix Grp., Inc. v. United States*, 121 Fed. Cl. 592, 597 (2015) (quoting *Thomas v. Union Carbide*, 473 U.S. 568, 581 (1985)).

According to the Government, "[f]or this claim to be ripe, PWI would have had to allege that a dispute arose between the parties regarding this claim, which [NPS asserts] PWI has failed to do."  ECF No. 14 at 2.  Not so.  PWI must allege that the Government breached its contract and, therefore, owes PWI money damages.  PWI has done so.  Its Complaint seeks recovery for *all* costs incurred in connection with replacing the Cliff House HVAC system—not just the $956,571 initially assessed by NPS.  ECF No. 1 at ¶¶ 143-46.  This is because PWI believes NPS's computation excludes certain expenses associated with the project, such as labor and financing costs, for which it is owed compensation.  ECF No. 1 at ¶¶ 186-87.  In other words, PWI alleges an entitlement to "additional expenditures in constructing the HVAC system, in an amount to be determined at trial . . . ."  ECF No. 1 at ¶ 187.

Indeed, PWI completed the HVAC project in 2020, *see* ECF No. 1 at ¶ 143, and had incurred all the additional costs as of filing its Complaint.  Therefore, PWI's claim is neither

hypothetical, nor does it turn on future events that may not occur.  Whether PWI submitted this claim to NPS prior to initiating this litigation is irrelevant to the ripeness of its claim.  Indeed, "[c]oncession contracts are not contracts within the meaning of 41 U.S.C. 601 et seq. (the Contract Disputes Act)," and PWI is not obligated to file any such claims with NPS prior to bringing suit in this Court.  36 C.F.R. § 51.3 (2008); *see Frazier v. United States*, 67 Fed. Cl. 56, 58-59 (2005); *Coffee Connections, Inc. v. United States*, 113 Fed. Cl. 741, 752 (2013) ("[T]he CDA's administrative procedures have no application and a plaintiff would not be required by the statute to file an administrative claim prior to filing suit in this court.").  Because NPS has no statutory or regulatory procedure in place for a concession contractor to first submit a claim for compensation under its contract, there are no processes PWI failed to pursue at the administrative level.  Accordingly, PWI's claim is ripe for review.  Of course, if NPS concludes that PWI is, in fact, owed additional compensation and does not dispute the additional amount PWI claims, it may settle this claim.  But there is nothing about this claim that is not ripe for litigation.

**B.     Because an express contract exists covering the same subject matter, the Court dismisses the implied-in-fact contract claims under RCFC 12(c).**

The Government moves to dismiss PWI's implied-in-fact contract claims under RCFC 12(b)(1), ECF No. 12 at 31-34, and, alternatively, under RCFC 12(c), ECF No. 12 at 48-51, because the express contract between the parties covers the same subject matter as the alleged implied-in-fact contract.  Because the Court must assure itself of jurisdiction at the outset, it addresses the RCFC 12(b)(1) argument first.

1.     This Court has subject matter jurisdiction to hear PWI's implied-in-fact contract claims.

According to the Government, because the parties signed three extensions of the Contract, there cannot be any implied-in-fact contracts covering the same subject matter as the Contract.  This much is indisputable because "an implied-in-fact contract cannot exist if an express contract already covers the same subject matter." *Trauma Serv. Grp. v. United States*, 104 F.3d 1321, 1326 (Fed. Cir. 1997) (citations omitted); *see also Bitmanagement Software GmBH v. United States*, 989 F.3d 938 949 (Fed. Cir. 2021) (citations omitted); *Seh Ahn Lee v. United States*, 895 F.3d 1363, 1370 (Fed. Cir. 2018) (citations omitted).  PWI acknowledges that it had an express concession contract—the Contract—with NPS governing the amount the Government would pay at the end of the Contract for the capital improvements to the restaurant. "Accordingly, in order to prevail on their implied-in-fact contract claim, the plaintiffs must show that their express contracts were void." *Seh Ahn Lee*, 895 F.3d at 1370.  To meet this burden, PWI alleges that the Contract was not validly extended past its expiration on June 30, 2018, because the Government failed to comply with a mandatory public notice requirement of the governing regulations.  ECF No. 1 at ¶ 101.  PWI further alleges that an implied-in-fact contract arose after that date governing their relationship.  ECF No. 1 at ¶ 103.  In other words, if PWI is correct, there is no express contract relevant to this dispute and the parties' relationship was governed by an implied-in-fact contract after June 30, 2018.

Generally, a nonfrivolous allegation of a contract or an implied-in-fact contract are sufficient to establish this Court's jurisdiction. *E.g.*, *Columbus Reg'l Hosp. v. United States*, 990

F.3d 1330, 1341 (Fed. Cir. 2021) ("[I]n order to overcome the government's motion to dismiss under Rule 12(b)(1), [plaintiff] was merely required to set forth a non-frivolous allegation of breach of a contract with the government."); *Seh Ahn Lee*, 895 F.3d at 1366; *Engage Learning, Inc. v. Salazar*, 660 F.3d 1346, 1353 (Fed. Cir. 2011); *Lewis v. United States*, 70 F.3d 597, 602, 604 (Fed. Cir. 1995); *Gould, Inc. v. United States*, 67 F.3d 925, 929-30 (Fed. Cir. 1995). And "[a] well-pleaded allegation in the complaint is sufficient to overcome challenges to jurisdiction." *Trauma Serv. Grp. v. United States*, 104 F.3d 1321, 1325 (Fed. Cir. 1997) (citation omitted). Here, PWI makes a nonfrivolous argument that the Government's failure to comply with a pre-extension notice requirement deprived it of the authority to extend the Contract past June 30, 2018. The regulation could not be clearer. It states that to extend the Contract beyond its end date (June 30, 2018), the agency "*must* publish notice in the Federal Register of the proposed extension at least 30 days in advance of the award of the extension (except in emergency situations)." 36 C.F.R. § 51.23 (emphasis added). It is also not disputed that the Agency failed to provide any advance notice of the Contract extensions in this case. Because PWI's claims are nonfrivolous, the Court denies the motion to dismiss PWI's implied-in-fact contract claims for lack of subject matter jurisdiction. That is not to say that PWI is correct, only that this Court has the jurisdiction to decide the issue.

      2.      <u>The parties extended the express Contract past June 30, 2018.</u>

The Government alternatively moves to dismiss PWI's implied-in-fact contract claims for failing to plausibly allege the existence of any such contract. As originally drafted, the Contract expired on June 30, 2018, and the 1998 Act imposes certain limits on the ability of the Secretary to extend existing concession contracts, including those under the 1965 Act. Specifically, the Secretary may only extend a contract to avoid interruption of services and must "take all reasonable and appropriate steps to consider alternatives to avoid the interruption." 54 U.S.C. § 101913(11)(A). An NPS regulation also requires NPS to issue a public notice in the Federal Register at least 30 days prior to the extension. 36 C.F.R. § 51.23. PWI argues that because NPS failed to publish notice in the Federal Register before extending the Contract, the Contract was not validly extended beyond its initial term and the extensions are void. ECF No. 13 at 9-10.

On this point, the NPS regulations could not be any clearer. They require that NPS "*must* publish notice in the Federal Register of [any] proposed extension at least 30 days in advance of the award of the extension (except in emergency situations) . . . ." 36 C.F.R. § 51.23 (emphasis added). Given that this regulation is the product of a notice-and-comment rulemaking process, *see* 79 FR 58261-01 (Summary of Public Comments), the Court does not lightly excuse noncompliance. And it is beyond dispute that NPS failed to provide the required notice in advance of any of the Contract extensions in this case:

| Contract Extension Execution | Federal Register Notice |
| --- | --- |
| Feb. 12, 2018 (ECF No. 12-1 at A118) | Feb. 28, 2018 (83 FR 8701-02) |
| Dec. 12, 2018 (ECF No. 12-1 at A117) | Mar. 20, 2019 (84 FR 10330-02) |

| Dec. 9, 2019 (ECF No. 12-1 at A116) | Sept. 3, 2020 (85 FR 55028-01) |

And it is more troubling that when NPS belatedly published these notices, it stated that it "intends" to extend the Contract (among others) in the future rather than stating that it had, in fact, *already* extended it. NPS gives no reason for why it failed to provide advance notice for any of the extensions of PWI's Contract.

PWI thus argues that, although "minor deviations from applicable regulations can but do not automatically result in a contract being invalid, . . . 'there cannot be a contract when the government agent lacks actual authority to create one.'" ECF No. 13 at 9 (quoting *CACI, Inc. v. Stone*, 990 F.2d 1233, 1237 (1993)). Because the extensions were void, PWI argues that an implied-in-fact contract arose following expiration of the Contract's initial term in 2018. Specifically, PWI argues that "NPS's knowing failure to comply with the mandatory and exceptionally clear requirement that any award of an extension of an existing concession contract be preceded by a publication in the Federal Register" resulted in "NPS's effort to award an extension of the concession contract [being] clearly not authorized by law and thus not legally valid." ECF No. 13 at 11.

While it is true that NPS failed to publish notice in advance, the regulation at issue is silent as to consequences for noncompliance. 36 C.F.R. § 51.23. And "there is no presumption or general rule that for every duty imposed upon . . . the Government . . . there must exist some corollary punitive sanction for departures or omissions, even if negligent." *United States v. Montalvo-Murillo*, 495 U.S. 711, 717-21 (1986). When "a statute 'does not specifically provide for the invalidation of contracts which are made in violation of [its provisions],' the proper inquiry is 'whether the sanction of nonenforcement is consistent with and essential to effectuating the public policy embodied in [the statute].'" *Seh Ahn Lee*, 895 F.3d at 1372 (quoting *Am. Tel. & Tel. Co. v. United States*, 177 F.3d 1368, 1374 (Fed. Cir. 1999) (en banc) (alterations in original) (additional citation omitted)). And setting aside fully performed contracts is not favored. *AT&T*, 177 F.3d at 1375. This rationale applies equally to regulatory time limits. *E.g.*, *Dixon Ticonderoga Co. v. United States*, 468 F.3d 1353 (Fed. Cir. 2006).

To understand the policy embodied in the regulation, the Court begins with an examination of the statute under which the regulation was promulgated. The 1998 Act requires that NPS award concession contracts through a competitive process unless certain exceptions apply. 54 U.S.C. § 101913(1). Among the exceptions to the competition requirement is an authorization for NPS to award "an extension of an existing concession contract for a term not to exceed 3 years, except that prior to making the award, the Secretary shall take all reasonable and appropriate steps to consider alternatives to avoid the interruption [in services]." *Id.* § 101913(11)(A). That said, Congress authorized such contract extensions "*without* public solicitation." *Id.* (emphasis added). And the Contract requires only that an extension be in writing and agreed to by the parties. ECF No. 12-1 at A31 ("This CONTRACT may not be extended, renewed or amended in any respect except when agreed to in writing by the Secretary and the Concessioner.").

36 C.F.R. § 51.23's notice requirement, therefore, is not statutorily or contractually mandated. Instead, the notice requirement clearly promotes public awareness of extensions to

ensure NPS is considering competition prior to noncompetitive contract extensions. Thus, the question is whether setting aside—at the contractor's request—an already completed contract extension issued without advance public notice is essential to promoting the competitive procurement of concession contracts. It is not.

PWI had no complaint when it agreed to each of the contract extensions without prior public notice. ECF No. 12-1 at A116-18 (contract extensions including PWI's agreement). And the lack of prior notice was objectively verifiable at the time PWI signed each of the extensions. Had a potential *competitor* complained of the lack of notice around the time of the Contract extensions, the Court would face a very different question. As the Circuit explained, "[p]recedent shows that those contracts that have been nullified, based on a failure to meet a statutory or regulatory requirement, are contracts that have not been substantially performed." *AT&T*, 177 F.3d at 1375 (citations omitted). Thus, "[i]t is not surprising that much of the litigation raising issues of violation of statute or regulation at the inception of government contracts has arisen in the bid protest context, where the asserted illegality has been explored before substantial performance has occurred." *Id.* But allowing the *recipient* of non-publicized contract extensions to wait until after the conclusion of performance to challenge the validity of the contract extensions based on the lack of proper public notice is not necessary, much less essential, to effectuate the policy underlying the publication requirement—ensuring a competitive process. *Seh Ahn Lee*, 895 F.3d at 1372.

PWI, however, contends that *Seh Ahn Lee* and *AT&T* do not apply because the extensions here were plainly unlawful and, therefore, they were void under *John Reiner & Co. v. United States*, 325 F.2d 438 (Ct. Cl. 1963), and its progeny. PWI primarily relies upon *CACI, Inc. v. Stone*, 990 F.2d 1233 (Fed. Cir. 1993), where the Federal Circuit held that when an agency lacks procurement authority, "the contract is void." *Id.* at 1236. But *CACI* is readily distinguishable from this case. In *CACI*, Congress "vest[ed] in the GSA Administrator *exclusive authority* to provide for the purchase, lease, and maintenance of ADP[8] equipment." *CACI*, 990 F.2d at 1235 (emphasis added). The GSA Administrator could delegate that authority if he or she chose to. But in *CACI*, the Army awarded a contract for ADP equipment to VSE Corporation even though "the Army had no delegation of procurement authority from GSA . . . ." *Id.* As a result, "the Army had no actual authority to contract with VSE, and therefore the contract [was] void." *Id.* In other words, the contractual defect in *CACI* was the lack of actual authority to enter the ADP contract at all, which is a clear requirement for any valid contract with the United States. *E.g.*, *Snyder & Assoc. Acquisitions LLC v. United States*, 133 Fed. Cl. 120, 126 (2017) ("Government agents must have actual authority to bind the Government in contract—they do not have apparent authority.") (citing *Winter v. Cath-dr/Balti Joint Venture*, 497 F.3d 1339, 1344-45 (Fed. Cir. 2007)). Here, however, Congress vested in NPS authority to grant the extensions of concession contracts without publication. 54 U.S.C. § 101913(11)(A).

The issue is not whether Congress vested NPS with the authority to extend the concession contract, but whether NPS's failure to comply with the regulatory notice requirement deprived it of the authority to grant the contract extensions. Thus, this case is much more analogous to *AT&T* than it is to *CACI*. In *AT&T*, Congress prohibited the Department of Defense from

---

[8] "ADP" stands for "automatic data processing." *CACI*, 990 F.2d at 1234.

"obligat[ing] or expend[ing]" any funds for fixed price contracts over $10 million for major systems unless a senior official performed a risk analysis and the Department provided a report to Congress. *AT&T*, 177 F.3d at 1371-72. Because the Department failed to perform the risk assessment or report to Congress, the question confronting the Federal Circuit in *AT&T* was whether those failures rendered the disputed contract void *ab initio*. They did not. Two facts were critical to the Circuit's analysis. First, there was nothing in the statute or its history indicating that Congress intended to void contracts issued in violation of the statute. *Id*. at 1373-1375. Here too there is nothing in the regulations indicating that the Secretary intended to void contract extensions that were not publicized in advance (Congress did not impose any notice requirement on NPS's authority to extend existing concession contracts). Second, the Circuit focused on the fact that the contract in *AT&T* was fully performed when the dispute arose. *Id*. at 1375-76. As the Circuit explained, "[t]he invalidation of a contract after it has been fully performed is not favored." *Id*. at 1375. The same is true here. The failure to provide the required notice does not void the fully performed Contract extensions. And the existence of the express Contract precludes the existence of an implied-in-fact contract.

Because the Court dismisses the implied-in-fact contract claims, it must also dismiss the *quantum valebant* and *quantum meruit* claims regarding the HVAC system as well. The Federal Circuit has explained that "[w]here a benefit has been conferred . . . on the government in the form of goods or services, which it accepted, a [party] may recover at least on a *quantum valebant* or *quantum meruit* basis for the value of the conforming goods or services received by the government prior to the rescission of the contract for invalidity. The contractor is not compensated under the contract, but rather under an implied-in-fact contract." *United Pac. Ins. Co. v. United States*, 464 F.3d 1325, 1329-30 (Fed. Cir. 2006). PWI argues that "NPS [] breached its implied-in-fact contractual duty to compensate PWI for the full value of the HVAC system[,] . . . which value both parties agreed totaled at least $956,571." ECF No. 1 at ¶ 186. Because the express Contract is valid, any claims under *quantum meruit* and *quantum valebant* are dismissed.

3.      The Contract extensions were not new contracts that converted PWI's possessory interest into a leasehold surrender interest.

PWI contends that if the Court determines the Contract extended past June 30, 2018, a new concession contract was formed under the 1998 Act. This would be significant because the 1998 Act provides that "a concessioner awarded a new concession contract to replace an existing concession contract after November 13, 1998, instead of directly receiving the possessory interest compensation, shall have a leasehold surrender interest in its existing possessory interest improvements under the terms of the new concession contract." 54 U.S.C. § 101915(c)(2). According to PWI, "[a]ny interpretation of the statutory language which concludes that extensions are not included as 'new concessions contracts' clearly contradicts the very plain language of the 1998 Concessions Act." ECF No. 13 at 35. Thus, the question is whether a contract extension is "a new concession contract" that "replac[es] an existing contract" under the 1998 Act.

PWI argues that the extensions in this case are awards of new contracts based on certain references in the statutory text. First, PWI argues that the 1998 Act treats all contract extensions as new contracts because it provides that:

> Except as otherwise provided in this section, *prior to awarding a new concession contract (including renewals or extensions of existing concession contracts) the Secretary*--
>
> (A) shall publicly solicit proposals for the concession contract . . . .

54 U.S.C. § 101913(2) (emphasis added).  Based on the emphasized language, PWI contends that the statute makes clear that contract extensions are new concession contracts.  The 1998 Act further provides that:

> Notwithstanding this section, the Secretary may award, without public solicitation, the following:
>
> (A) Temporary contract.--To avoid interruption of services to the public at a System unit, *the Secretary may award a temporary concession contract or an extension of an existing concessions contract* for a term not to exceed 3 years, except that prior to making the award, the Secretary shall take all reasonable and appropriate steps to consider alternatives to avoid the interruption.
>
> (B) Contract in extraordinary circumstances.--The Secretary may award a concession contract in extraordinary circumstances where compelling and equitable considerations require the award of a concession contract to a particular party in the public interest.

54 U.S.C. § 101913(11) (emphasis added).  Here, too, the text refers to the Secretary making an "award" of an extension, which implies it is a new contract.  These arguments rest on the Civilian Board of Contract Appeals' ("CBCA") interpretation of the 1998 Act: "Under the Act, an extension of an existing concessions contract issued after the Acts [sic] effective date is expressly treated as a new concessions contract."  *Libbey Physical Med. Ctr.*, CBCA No. 1305, 09-1 B.C.A. (CCH) ¶ 34080, 2009 WL 2762530 (Feb. 26, 2009).  Thus, the CBCA concluded that the first extension of an existing concession contract resulted in the transformation of a concessioner's possessory interest into a leasehold interest.  *Id*.

But the CBCA's analysis is not persuasive; rather, this Court finds the analysis in *Seven Resorts, Inc. v. United States*, 112 Fed. Cl. 745 (2013), more persuasive because its interpretation of the 1998 Act affords meaning to all sections of the 1998 Act.  Specifically, *Seven Resorts* recognizes the difference between a "concession contract" and an "extension of a concession contract" in the 1998 Act.  *Id*. at 772-73.  There are various types of concession contracts discussed in the 1998 Act that refer to new contracts.  The 1998 Act refers to a "new concession contract," 54 U.S.C. § 101913(2), concession contract "renewals," *id*.; *see also id*. §§ 101913(7)-(8), "temporary concession contracts," *id*. § 101913(11)(A), and "concession contract[s] awarded in extraordinary circumstances," *id*. § 101913(11)(B).  But the 1998 Act makes clear that a contract extension is not one of these "concession contracts."  Specifically, the 1998 Act differentiates between the award of these new contracts and the extension of an existing contract when it provides that "the Secretary may award a temporary concession contract *or* an extension of an existing concessions contract."  54 U.S.C. § 101913(11)(A).  Given the disjunctive, it

would render the distinction between a "temporary concession contract" and the "extension of an existing concessions contract" meaningless to equate the two. *Seven Resorts*, 112 Fed. Cl. at 773. But the Court is to provide meaning to all statutory provisions. *E.g.*, *id.*, at 773 (collecting cases).

And the 1998 Act's references to both "renewals" and "extensions" provides further evidence of what an extension is (and is not) under the statute. A contract extension is "[t]he continuation *of the same contract* for a specified period." Black's Law Dictionary (11th ed. 2019) (emphasis added); *see also Bordeaux v. Lions Gate Ent., Inc.*, No. 22-cv-4244-SVW-PLA, 2022 WL 19076668, *8 (C.D. Cal. Dec. 28, 2022) (applying the Black's definition); *Citgo Petroleum Corp. v. Integrys Energy Servs., Inc.*, No. 10 C 4743, 2012 WL 2129402, *10 n.10 (N.D. Ill. June 12, 2012) (same). Black's Law Dictionary contrasts a contract "extension" with a contract "renewal," which it defines as "[t]he re-creation of a legal relationship or the replacement of an old contract with a new contract, *as opposed to the mere extension of a previous relationship or contract.*" Black's Law Dictionary (11th ed. 2019) (emphasis added). This indicates that an extension under the 1998 Act does not create a new contract; it merely extends the prior contract. That is what the extensions here say they do. Specifically, each extension states: "the Contract is hereby extended until" a specified date. ECF No. 12-1 at A116-18. The extensions are, therefore, bilateral contract amendments that extend the term of the Contract pursuant to Section 18(f) of the Contract, exercised in compliance with the 1998 Act's requirements, rather than new contract awards. ECF No. 12-1 at A32 ("This CONTRACT may not be extended, renewed or amended in any respect except when agreed in writing by the Secretary and the Concessioner.").

And this distinction is important because the 1998 Act does not provide for the conversion of a possessory interest into a leasehold surrender interest merely by the extension of a contract. Rather, the 1998 Act only provides for the conversion of a possessory interest to a leasehold surrender interest if the "concessioner [is] awarded *a new concession contract to replace an existing concession contract* after November 13, 1998 . . . ." 54 U.S.C. § 101915(c)(2) (emphasis added). Because the Contract extensions were not "new concession contract[s]," they did not trigger the conversion of PWI's possessory interest into a leasehold interest. Nor could it be said that the extensions "replaced" the Contract. Again, the extensions did not take the place of the Contract; they merely extended its term.

Finally, it is true, as PWI argues, that 54 U.S.C. § 101913(2) provides that "prior to awarding a new concession contract (including renewals or extensions of existing concession contracts) the Secretary shall . . . ." While PWI and the CBCA rely on this "including" parenthetical to argue that the 1998 Act clearly defines a "new concession contract" to include extensions of existing concession contracts, this argument ignores the distinction between concession contracts and extensions in § 101913(11)(A). *Seven Resorts*, 112 Fed. Cl. at 772. And § 101913(2) is not defining the term "new concession contract"; rather, it addresses the public solicitation requirements that apply to new contracts and contract extensions. *Id.* at 772-73.

For these reasons, PWI has failed to plausibly allege that a new contractual relationship arose after June 30, 2018, that converted its possessory interest into a leasehold interest.

**C.      The Government did not have a duty to award a successor contract in advance of PWI's contract expiration on December 31, 2020.**

PWI alleges NPS breached the express terms of the Contract and governing law when it failed to award a contract or a lease to a successor before the Contract expired, which deprived PWI of its right to sell its tangible and intangible property to the successor.  *See* ECF No. 1 at ¶¶ 183-85.  PWI relies on Section 13(b)(1) of the Contract, asserting "NPS . . . had to require that successor to purchase PWI's Possessory Interest and all other tangible property . . . and pay PWI the fair value of the tangible property.  This right is implemented after the Contract expires and therefore clearly survives the expiration of the Contract."  ECF No. 1 at ¶¶ 32-33.

> PWI is not asserting that NPS had a duty to select a successor. Instead, PWI has alleged that, once NPS does decide to select a successor, NPS has a duty, including its duty to cooperate and engage in fair dealing, to ensure that PWI obtains the benefit of the bargain to which PWI is entitled when NPS decides to proceed with a successor. The concession [C]ontract clearly sets out PWI's rights in such a situation in Section 13(b).  However, NPS violated its obligation not to act so as to destroy PWI's reasonable expectation as to it receiving the fruits of the [C]ontract in such a situation.

ECF No. 13 at 31.  According to PWI, NPS improperly demanded removal of its tangible personal property from the Cliff House premises after electing not to appoint an "immediate successor" following the Contract's expiration.  ECF No. 1 at ¶¶ 152, 164-65.  And, because Section 13(b) "refers to any successor, not just an immediate successor[,] . . . PWI desired to leave its personal property at the facility . . . [and] facilitate a sale of that property to the successor as was its right under Section 13(b)(1)(ii)[,] which survived the expiration of the Contract . . . ."  ECF No. 1 at ¶ 153, 165.  Instead, NPS forced PWI to sell its tangible personal property at auction to "mitigate its damages."  ECF No. 1 at ¶ 154.

Indeed, PWI alleges it "reluctantly" agreed to extend the Contract based, in part, on its assumption that a new lessee would be selected "in early 2020 and the awardee, whether Aramark or another qualified operator, under Section 13(b)(1) of the Contract would be required to purchase PWI's tangible property used in the operation, pay its Possessory Interest in the improvements constructed, and [] license the name The Cliff House . . . ."  ECF No. 1 at ¶ 154. Although "NPS clearly intended to continue contract operations using a successor[,] . . . NPS inexplicably failed to take necessary and appropriate steps, as it was required by law, to have a successor in place to avoid any need to retain PWI for the purpose of avoiding an interruption in services."  ECF No. 13 at 31-32 (citing 54 U.S.C. § 101913(11)(A)).  This, PWI contends, evinces "deliberate efforts to deny PWI the fruits of the contract which PWI reasonably expected and to which it was entitled" and further "creates a reasonable inference that NPS' delay was calculated to deny PWI these rights, which is a clear violation of NPS' duty of good faith and fair dealing and thus a violation of the contract."  ECF No. 13 at 32; *see also* ECF No. 13 at 28 n.13; *see also* ECF No.1 at 2 (Preamble) ("NPS disingenuously asserted that NPS was 'temporarily' discontinuing operations and therefore PWI had no right under the contact to sell

any of its property to the successor. NPS then demanded that PWI remove its personal property from the premises, forcing PWI to conduct a fire sale to mitigate its damages.").

According to the Government, "only an immediate successor, assuming one exists, is relevant to the property-sale issue based on Section 13(b)(1)'s reference to 'at the time of such event'—the relevant event being contract expiration." ECF No. 12 at 46. But "nothing in that provision supports PWI's claim that NPS had a duty to have a successor contractor in place at contract expiration." *Id.* To be sure, the Contract does not impose an affirmative duty on NPS to secure a successor in advance of contract expiration—or at any time. Rather, the 1998 Act affords NPS sole discretion to determine whether to solicit or award a concession contract. 54 U.S.C. § 101913(10) ("Nothing in this subchapter shall be construed as limiting the authority of the Secretary to determine whether to issue a concession contract or to establish its terms and conditions in furtherance of the policies expressed in this subchapter."). While NPS did not identify a successor to purchase PWI's property at the time of the Contract's expiration, neither the Contract, nor governing law, imposed such a "duty," express or implied, on NPS. 54 U.S.C. § 101913; 36 C.F.R. § 51.20 ("[n]othing in this part may be construed as limiting the authority of the Director at any time to determine whether to solicit or award a concession contract, to cancel a solicitation, or to terminate a concession contract in accordance with its terms."). And, as established by NPS regulations, "[n]o offeror or other person will obtain compensable or other legal rights as a result of an amended, extended, canceled, or resolicited solicitation for a concession contract." 36 C.F.R. § 51.11.

PWI's allegation that "NPS fully intended to continue operations and select a successor but engaged in grossly negligent as well as deliberate actions to deny PWI the fruits of the contract to which PWI was entitled" is without merit. *See* ECF No. 13 at 33. As this Court has established, NPS did not have a duty to select a successor and acted within its discretion in electing to discontinue Cliff House operations upon the Contract's expiration. Further, the express terms of the Contract require PWI to remove its tangible personal property from the premises upon expiration. Requiring PWI to fulfill this contractual obligation does not violate NPS's duty of good faith and fair dealing. PWI must allege more than "threadbare recitals of a cause of action's elements" and "mere conclusory statements" to survive a motion to dismiss. *See Ashcroft*, 556 U.S. at 678.

### D.     PWI has failed to plausibly allege that the Government unlawfully discontinued operations of the Cliff House.

PWI urges this Court to disregard the Contract's compensation scheme because NPS unlawfully discontinued operations under Section 13(c). *See* ECF No. 13 at 26. Instead, PWI asks this Court to invoke the statutory default compensation scheme of sound value, which does not "take into account any scheduled depreciation." ECF No. 1 at ¶ 37 (citing 54 U.S.C. § 101915(c); 16 U.S.C. § 20e). PWI alleges that a "discontinuation" of operations pursuant to Section 13(c) must be permanent, and NPS intended only a "temporary suspension" due to the COVID-19 pandemic. ECF No. 1 at ¶ 166 ("This is a temporary suspension of services. While the solicitation process for this operation is currently paused as a result of the pandemic, it is the intent of the NPS to welcome the public back in the future."). And, PWI argues, "[a] temporary suspension of services where a successor will be brought in at some point does not credibly qualify as a 'discontinuation' of services which would trigger Section 13(c) of the Contract."

ECF No. 1 at ¶ 167.  Indeed, "[i]n August, 2021, NPS announced that it was resuming its process to select a successor and anticipated having a new lease in place by late 2022."  ECF No. 1 at ¶ 178.

The Government rejects PWI's theory on the grounds that the Contract affords "NPS with broad discretion related to the discontinuation of a concession contract.  In particular, Section 13(c) . . . [provides] no limitation on NPS's discretion to discontinue operations.  Because NPS determined to discontinue operations at the Cliff House, Section 13(c) of the contract governed the manner and method of compensation and disposition of PWI's tangible personal property."  ECF No. 12 at 42-43.  Further, the Government explains that the plain meaning of the word "discontinuation" does not support PWI's claim.  "Merriam-Webster's online dictionary defines 'discontinue' as 'to break the continuity of: cease to operate, administer, use, produce, or take,' or 'to abandon or terminate by a legal discontinuance.'  The online Cambridge Dictionary defines it as 'to stop doing or providing something.'"  ECF No. 12 at 43-44 (citing *Discontinue*, https://www.merriam-webster.com/dictionary/discontinue (last visited Jan. 27, 2022) & *Discontinue*, https://dictionary.cambridge.org/us/dictionary/english/discontinue (last visited Jan. 27, 2022)).  Notably, neither definition requires that a "discontinuation" be permanent—a mere "break [in] the continuity" of operations will suffice. ECF No. 12 at 43.  And, when a concessioner has "obtained a possessory interest . . . under the terms of a concession contract entered into before November 13, 1998," as here, the concessioner "shall, on the expiration or termination of the concession contract, be entitled to received compensation for the possessory interest improvements in the amount and manner described by the concession contract."  54 U.S.C. § 101915(c)(1).  Only if "that possessory interest is not described in the existing concession contract" shall sound value apply to determine "compensation of possessory interest . . . ."  *Id.*

"If for any reason, . . . the Concessioner [] cease[s] to be required by the Secretary to conduct operations . . . and the Secretary *at the time chooses to discontinue such operations*," Section 13(c) governs compensation under the Contract.  ECF No. 1-1 at 25 (emphasis added).  On December 3, 2020, NPS informed PWI that it did "not intend to proceed with issuing a request for proposals for the Lands End Restaurant Properties[9] lease.  Therefore, Section 13(c) of [the] Contract, where operations are to be discontinued, applies to [its] expiration."  ECF No. 1-1 at A233.

In the alternative, PWI argues that, "[e]ven if NPS had chosen to discontinue the operations at issue as of June 30, 2018 and/or abandon, remove or demolish PWI's Improvements, which NPS did not choose to do, NPS was required under Section 13(c) of the Contract to take such actions as may be necessary to assure that PWI was compensated for its Possessory Interest value as of June 30, 2018."  ECF No. 1 at ¶ 190.  And, because "NPS did not take any such actions to assure that PWI was compensated for its Possessory Interest value as of June 30, 2018[,] . . .  NPS breached Section 13(c) of the Contract even if had chosen to discontinue the operations as of June 30, 2018."  ECF No. 1 at ¶ 191-192.  However, as this Court has established, PWI and NPS validly extended the Contract until December 31, 2020.

---

[9] The Lands End Restaurant Properties formerly operated as the "Cliff House and Lands End Lookout Café."  *See https://www.nps.gov/goga/getinvolved/landsendrfp.htm.*

The express terms of the Contract required NPS to compensate PWI for its possessory interest as of its expiration or termination—i.e., as of December 31, 2020—not upon the expiration of the initial term.

NPS acted within its discretion when it elected to cancel the Cliff House successor solicitation due to the impact of COVID-19.  Because PWI "shut[] down operations in March 2020[,]" *see* ECF No. 1 at ¶ 140, NPS's decision not to select a successor resulted in the "break [in] the continuity of operations" "at the time" of the Contract's expiration.  *See* ECF No. 1-1 at 23.  Therefore, the "amount and manner" of compensation set forth in Section 13(c) of the Contract—including the depreciation schedule to which both Parties agreed in Amendment No. 2—applies to calculate PWI's possessory interest and its disposition of tangible personal property.

###### E.   The Government's calculation of PWI's net possessory interest value is consistent with the express terms of the Contract and governing law.

PWI alleges that, because the "original concession contract was not legally extended past June 30, 2018 but instead expired on that date[,]" NPS inappropriately applied the depreciation schedule through December 31, 2020 to calculate its net possessory interest.  ECF No. 13 at 21; ECF No. 1 at ¶¶ 179-96.  Specifically, PWI claims:

> 84. NPS did not state to PWI that the agency believed the scheduled depreciation of PWI's Possessory Interest value, which was solely for the benefit of NPS and to the detriment of PWI, would continue past the Contract's expiration date of June 30, 2018[;]

> 85. Nor is there any language in the Contract which would indicate that depreciation deduction would survive after the Contract expired[;]

> 86. Nor did PWI believe that, by PWI agreeing to continue to operate at the request of NPS to give the agency more time to select a successor and avoid an interruption to the public's enjoyment of the facility, any reduction of its Possessory Interest value would continue after June 30, 2018.

ECF No. 1 at ¶¶ 84-86.  Further, according to PWI, "*even if* the original concession contract was legally extended past June 30, 2018, the plain terms of that contract show that the reductions were intended to end as of June 30, 2018."  ECF No. 13 at 22.

"To recover for breach of contract, a party must allege and establish: (1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach."  *San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989).  It is well settled that a "party breaches a contract when it is in material non-compliance with the terms of the contract."  *Gilbert v. Dep't of Just.* 334 F.3d 1065, 1071 (Fed. Cir. 2003) (citation omitted).  Such "material non-compliance" constitutes breach when it relates to "a matter of vital importance and goes to the essence of the

contract." *Williams v. United States*, 144 Fed. Cl. 218, 231 (2019) (quoting *Thomas v. Dep't of Hous. & Urban Dev.*, 124 F.3d 1439, 1442 (Fed. Cir. 1997)). And, if a contract's "provisions are clear and unambiguous, they must be given their plain and ordinary meaning." *Alaska Lumber & Pulp Co. v. Madigan*, 2 F.3d 389, 392 (Fed. Cir. 1993); *see also TEG-Paradigm Envtl., Inc. v. United States*, 465 F.3d 1329, 1338 (Fed. Cir. 2006) (plain and ordinary meaning can be "derived from the contract by a reasonably intelligent person acquainted with the contemporaneous circumstances") (quotation omitted). Indeed, the Court must construe terms "in a manner that gives meaning to all of [the contract's] provisions and makes sense." *McAbee Const., Inc. v. United States*, 97 F.3d 1431, 1435 (Fed. Cir. 1996) (citing *Hughes Commc'ns Galaxy, Inc. v. United States*, 998 F.2d 953, 958 (Fed. Cir. 1993)). If the contract provisions are clear, "the [C]ourt may not resort to extrinsic evidence to interpret them." *Id.*; *see also City of Tacoma v. United States*, 31 F.3d 1130, 1134 (Fed. Cir. 1994) ("Outside evidence may not be brought in to create an ambiguity where the language is clear.").

The 1998 Act authorized NPS to award extensions of existing concessions contracts, including PWI's Contract, for up to three years. 54 U.S.C. § 101913(11)(A); *see also* 36 C.F.R. § 51.23. The statute further provides that "[a] concessioner that has obtained a possessory interest [under the 1965 Act] . . . shall, on the expiration or termination of the concession contract, be entitled to receive compensation for the possessory interest improvements *in the amount and manner as described by the concession contract*." 54 U.S.C. § 101915(c)(1) (emphasis added). "Contract interpretation is a matter of law and thus may be addressed by the Court in resolving a motion to dismiss." *Bell/Heery*, 739 F.3d at 1330. Here, the plain terms of the Contract as amended direct NPS to compensate PWI for its net possessory interest at the time of the Contract's termination or expiration in accordance with the straight-line depreciation schedule described in Exhibit C-2 of Amendment No. 2. ECF No. 1-1 at 42-44; *see also* ECF No. 1-1 at 42 ("the following . . . is a complete list, as of the date of this Amendment, of all Concessioner claims to Concessioner Possessory Interest in Government Improvements in existence following the completion to the Improvement Program to rehabilitate the Cliff House."). To be sure, the Contract unambiguously provides that "the fair value of Possessory Interest in Concessioner Improvements and Government Improvements made after the effective date of this Contract shall be . . . the original cost of the improvements less straight line depreciation over the estimated useful life of the asset." ECF No. 1-1 at 24.

Amendment No. 3 authorized NPS to prepay PWI's possessory interest, in whole or in part, prior to expiration or termination of the Contract. ECF No. 1-1 at 52-53. Accordingly, NPS prepaid a total amount of $3,600,000 to PWI between 2012 and 2018. ECF No. 12-1 at A279. NPS also issued letter agreements to PWI in advance of each prepayment, which reinforced the depreciation schedule set forth in Amendment No. 2. ECF No. 12-1 at A271-280. Specifically, NPS reiterated that "Amendment No. 2 . . . provided a detailed depreciation schedule of possessory interest . . . [and] the Contract, as amended, provides the actual basis for possessory interest and procedures for adjusting pre-payments, to calculate the concessioner's final amount of possessory interest compensation at the expiration of the contract." *Id.* Upon executing Amendment No. 2 on December 31, 2018, PWI held a total possessory interest value of $0 in Concessioner Improvements and $7,459,660.00 in Government Improvements. ECF No. 1-1 at 38. The depreciation schedule—as mutually agreed and set forth therein—reduced PWI's possessory interest to $3,674,358 as of December 31, 2020. ECF No. 101 at 42. And, after adjusting for (i) PWI's possessory interest in the HVAC system ($956,571); (ii) NPS's total

prepayments in the amount of $3,600,000; and (iii) inflation, PWI held a final possessory interest value of $374,925 as of the Contract's expiration on December 31, 2020.  ECF No. 12-1 at A257.

According to PWI, because the Contract expired on June 30, 2018, "[t]he scheduled depreciation of the Possessory Interest, . . . did not survive the expiration of the Contract" and NPS lacks "reasonable or equitable basis for [its] position given that PWI was operating at a loss while it stayed on to ensure the public was not denied the ability to enjoy The Cliff House experience."  ECF No. 1 at ¶ 170.  Additionally, PWI asserts, "at the end of their useful life, the improvements would still retain significant value because PWI and any successor concessioner was required to continue to maintain the improvements."  ECF No. 1 at ¶ 68.  Therefore, the "deductions for scheduled depreciation did not reflect the actual reduction in value of the improvements and do not represent the actual loss being incurred by NPS each year."  ECF No. 1 at ¶ 69.  While this may be so, it was as true on the day PWI signed the Contract in 1998 as it is today that straight-line depreciation does not reflect the actual reduction in value of capital assets.  Yet PWI and NPS entered into an express agreement under which the Parties agreed to calculate PWI's possessory interest based on a detailed straight-line depreciation schedule—not an asset's actual current value.  The Contract's depreciation schedule, as validly extended, therefore applies to calculate PWI's possessory interest as of December 31, 2020.  As Judge Horn explained in a similar context, "[b]ecause Seven Resorts obtained its possessory interest under a contract entered into before the passage of the 1998 Concessions Act, the 1998 Concessions Act provides that Seven Resorts was entitled to 'receive compensation' for its possessory interest upon the original concessions contract's expiration to the extent that its possessory interest was 'described' in the original concessions contract."  *Seven Resorts, Inc.*, 112 Fed. Cl. at 793.  If PWI intended to remove (or otherwise revise) the depreciation schedule to which it agreed under the express terms of the Contract, it should have negotiated for that change with NPS.  PWI cannot invalidate terms retroactively, and any such "claim is directly contrary to the terms of [the] contract."  *See Eldorado Canyon Resort, Inc. v. United States*, 209 Ct. Cl. 759, 760 (1976).

In the alternative, PWI argues that, because it operated at a "substantial loss due to the actions and decisions of NPS," ECF No. 1 at ¶ 55, depreciating its possessory interest after June 30, 2018, directly contradicts the Secretary's obligation to exercise authority "in a manner consistent with a reasonable opportunity for the concessioner to realize a profit on his operation as a whole commensurate with the capital invested and the obligations assumed."  16 U.S.C. § 20b(b); ECF No. 1 at ¶¶ 53-55.  This, PWI contends, violates NPS's implied duty of good faith and fair dealing.  *See* ECF No. 1 at ¶ 176 ("NPS refusal to pay PWI the amounts which NPS agreed were contractually owed to PWI unless PWI agreed to release its right to seek additional amounts PWI believed were owed was egregious, malicious and a clear attempt to put financial pressure on PWI to accept NPS' offer and waive its legal rights.").  Indeed, "[e]very contract, including one with the federal government, imposes upon each party an implied duty of good faith and fair dealing in its performance and enforcement."  *Dobyns v. United States*, 915 F.3d 733, 739 (Fed. Cir. 2019).  The duty of good faith and fair dealing encompasses "the duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract."  *Id*. (quoting *Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005)).  "[A]n act will not be found to violate the duty (which is implicit in the contract) if such a finding would be at odds with the terms of the

original bargain, whether by altering the contract's discernible allocation of risks and benefits or by conflicting with a contract provision." *Metcalf Constr. Co., Inc. v. United States*, 742 F.3d 984, 991 (Fed. Cir. 2014). In other words, "[t]he implied duty of good faith and fair dealing cannot expand a party's contractual duties beyond those in the express contract or create duties inconsistent with the contract's provisions." *Dobyns*, 915 F.3d at 739.

But, as this Court has established, the Contract provides for the "full and just compensation to the Concessioner from the Secretary *for all losses and claims* occasioned by the circumstances discussed [therein]." ECF No. 1-1 at 23 (emphasis added). And nothing in the Contract guarantees that PWI will make a profit under it. *Nat'l Parks & Conservation Ass'n v. Kleppe*, 547 F.2d 673, 684 (D.C. Cir. 1976) ("Subsection 20b(b) does not guarantee a profit; in fact, many park concessioners apparently lose money."). As the Government explains, "even if a concessioner does not realize a profit on its operations, its investment in capital improvements remains protected through the Government's payment of possessory interest . . . ." ECF No. 14 at 7. Specifically, "pursuant to 54 U.S.C. § 101915(c)(1) and the contract's Amendment No. 2, NPS determined PWI's possessory interest as of the date its contract expired on December 31, 2020." *Id*. Therefore, PWI has failed to plausibly allege breach of contract based on NPS's calculation of its net possessory interest.

### F.     PWI has plausibly alleged it is owed additional compensation for HVAC costs under the Contract.

PWI has, however, adequately alleged that it is owed additional compensation for costs associated with the HVAC replacement. ECF No. 1 ¶¶ 140-46. Given all that has transpired, the Court recaps the issues surrounding the HVAC replacement. Despite closing the Cliff House due to COVID-19, PWI continued the replacement of the HVAC system through 2020. *Id*. ¶ 140-41. PWI acknowledges that it agreed its possessory interest in the HVAC system—*i.e.*, its costs for the HVAC installation—totaled $956,571. *Id*. ¶ 143. But PWI claims to be owed more under the Contract for additional expenditures it made towards the HVAC replacement. *Id*. ¶¶ 145-46.

Although the Court has already dismissed the claims based on the implied-in-fact contract theory, including *quantum meruit* and *quantum valebant*, the question remains whether the Contract requires additional payment. PWI alleges that it does. The Government contends that it may or may not dispute these additional costs. Therefore, PWI has plausibly pled a contractual entitlement to these additional HVAC expenditures. *Twombly*, 550 U.S. at 555.

## IV.     Conclusion

For the foregoing reasons, the Court denies-in-part the Government's motion to dismiss, ECF No. 12, insofar as it seeks to dismiss PWI's claim for additional expenditures relating to the HVAC system under the contract and grants-in-part the motion as to other claims.

IT IS SO ORDERED.

s/ Edward H. Meyers
Edward H. Meyers
Judge